IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Sierra Newman, | CASE NO. 5:22-cv-01982 |
| Plaintiff, | DISTRICT JUDGE<br>J. Philip Calabrese |
| vs. | MAGISTRATE JUDGE<br>James E. Grimes Jr. |
| Commissioner of Social Security, | **REPORT &**<br>**RECOMMENDATION** |
| Defendant. | |

Plaintiff Sierra Newman filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

## Procedural background

In November 2019, Newman filed an application for supplemental security income alleging a disability onset date of February 1, 2017, and claiming that she was disabled due to depressive, bipolar, and related

disorders.[1] Tr. 112, 230–36. The Commissioner denied Newman's application at the initial level and upon reconsideration. Tr. 135–44, 148–53. In May 2021, an ALJ held a hearing at which Newman and a vocational expert testified. Tr. 83–111. In October 2021, the ALJ issued a written decision finding that Newman was not disabled. Tr. 11–29. The ALJ's decision became final in September 2022, when the Appeals Council declined further review. Tr. 1–4; *see* 20 C.F.R. § 404.981. Newman filed this action in November 2022. Doc. 1. She asserts the following assignments of error:

1. The ALJ committed harmful error at Step Three of the Sequential Evaluation when he failed to find that Newman satisfied the criteria of Listing 12.05 and/or 12.11.

2. The ALJ committed harmful error when he failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of Newman's symptoms precluded her from engaging in substantial gainful activity on a full-time and sustained basis.

3. The ALJ erred in that substantial evidence did not support the RFC finding that Newman could perform work at the light level of exertion.

Doc. 10, at 1.

---

[1]     By March 2021, Newman had added migraine headaches, intermittent explosive disorder, and asthma to her list of alleged impairments. Tr. 150. By August 2021, Newman was alleging disability due to bilateral carpal tunnel syndrome, left ankle osteoarthritis, asthma, major depression, bipolar disorder, and intermittent explosive disorder. Tr. 90–91.

**Factual background**

*1.  Personal and vocational evidence*

Newman was born in August 1990 and was 29 years old on her alleged disability onset date. Tr. 27, 92. She graduated from high school and completed some college. Tr. 254. Newman has no past relevant work. Tr. 28.

*2.  Physical impairment evidence[2]*

In December 2018, x-rays were taken of Newman's left ankle and foot after she complained of left ankle pain and numbness. Tr. 585. A radiologist observed remote avulsion fractures, soft tissue damage consistent with a remote ligament injury, and anterior impingement at Newman's ankle. Tr. 585, 626. There were mild degenerative changes in Newman's midfoot. Tr. *Id*.

In August 2019, Newman saw her primary care physician, Emily Godlewski, M.D., and complained of asthma and migraine headaches. Tr. 813. Dr. Godlewski found that Newman's head and neck, mouth and throat, chest and lungs, cardiovascular system, and neurologic system were normal. Tr. 814.

In October 2019, Newman saw Dr. Godlewski for a physical examination. Tr. 803. Dr. Godlewski observed that Newman was well-developed and obese. Tr. 804. Newman's muscle bulk and tone were normal. *Id*.  Newman complained about carpal tunnel syndrome in both of her hands and pain in her left ankle. Tr. 314. Dr. Godlewski found Newman's hands

---

[2]     This recitation of medical evidence is not intended to be exhaustive and is limited to the facts provided in the parties' briefs.

"neurovascularly intact." *Id*.  She injected Newman's wrists with steroids to treat Newman's pain. Tr. 805. When Newman informed Dr. Godlewski that using a brace on her right wrist had helped, Dr. Godlewski ordered Newman a left wrist brace. *Id*.

In March 2020, Newman saw Dr. Godlewski to address migraines and her gastroesophageal reflux disease (GERD) with occasional heartburn and regurgitation, which worsened with certain food triggers. Tr. 1057. Newman reported having migraine headaches two to three times per week. *Id*. She told Dr. Godlewski that Metoprolol helped her migraines "a little, but not enough" and denied any side effects from the medication. *Id*. Newman told Dr. Godlewski that she had stopped taking Ranitidine—her GERD medication— two weeks earlier because it "wasn't helping." Tr. 1057. Newman's physical and neuropsychiatric examinations were normal. Tr. 1058.

Near the end of 2020, Newman saw therapist Melissa Lombardi for physical therapy to address sharp, stabbing, aching pain in her lower back, "along both flanks," and across her shoulders. Tr. 869–905. Newman said that her pain "c[ame] and [went] but c[ould] last a long time." Tr. 869. Newman described hearing a "popping noise" on her right side, while she was lying down. *Id*. She said that she later heard the same noise on her left side. *Id*.

Newman also had carpal tunnel follow-ups with Louise Kolarik, M.D.— a colleague of Dr. Godlewski's—in November and December 2020. *See* Tr. 1040. In November, Dr. Kolarik gave Newman carpal tunnel steroidal injections. *Id*.

4

In December, Newman reported improvement in her wrist symptoms, which she described as tolerable. Tr. 1040. Newman mentioned her back pain and said she was receiving a noticeable benefit from physical therapy. *Id*. Newman expressed a desire to continue with physical therapy. *Id*.

By February 2021, Newman reported worsening carpal tunnel symptoms again, particularly on her right side. Tr. 1038. She told Dr. Kolarik that she had weakness, pain, and numbness in her first three fingers, and frequently dropped things as a result. *Id*. Dr. Kolarik examined Newman's wrists and found no swelling or physical deformity. *Id*. Newman had a positive Tinel's test[3] in both wrists and decreased strength and sensation in her right thumb. *Id*. Dr. Kolarik noted that conservative treatment—physical therapy, splints, and injections—had not helped Newman's symptoms. *Id*. Dr. Kolarik referred Newman to Tri-County Orthopedic Surgeons for potential carpal tunnel surgery. Tr. 1039.

In July 2021, Newman saw orthopedic surgeon Daniel Moretta, D.O., at Tri-County Orthopedic Surgeons. Tr. 1531. Newman reported bilateral hand and wrist pain. Tr. 1531. She complained of joint swelling, itching, numbness, and tingling. Tr. 1533. Dr. Moretta found that Newman had paresthesia in both hands that was consistent with cubital tunnel syndrome and noted that Newman's medial nerve may have some involvement in her symptoms as well.

---

[3]     Tinel's sign is "a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve." Dorland's Illustrated Medical Dictionary 1687 (33rd Ed. 2020).

Tr. 1531. Dr. Moretta ordered an electromyogram[4] and nerve test to evaluate Newman's upper extremities. Tr. 1531–32. He suggested that Newman follow-up after testing to discuss the results. Tr. 1532.

Newman underwent the electromyogram in August 2021. Tr. 1583. The results showed that she had carpal tunnel syndrome to a moderate degree in her right wrist and a mild degree in her left. *Id.*

That same month, Newman saw podiatrist Matthew Testrake, D.P.M. Tr. 1567. Newman complained of left ankle pain. *Id.* She described her pain as sharp, sore, throbbing, aching, and numb that was a "9" out of ten in severity. *Id.* Dr. Testrake found that Newman had neither swelling nor joint, back, or muscle pain. Tr. 1569. Newman's neurological exam was normal. *Id.* While the inside of Newman's left ankle was painful to the touch, she had full muscle strength and flexion in all directions. Tr. 1570. Newman's range of motion decreased upon extension and flexion of her left knee. Tr. 1569–70. X-ray images showed osteoarthritis in Newman's left ankle and ankylosis[5] in her distal tibia and fibula, though the ankylosis was stable. Tr. 1570, 1578. Dr. Testrake found that Newman did not have anxiety. Tr. 1569. She was

---

[4]     Electromyography is a diagnostic technique that records the activity of muscles (1) at rest, (2) during voluntary contractions, and (3) during electrical stimulation. Dorland's Illustrated Medical Dictionary 595  (33rd Ed. 2020). An electromyogram is the record obtained from electromyography. *Id.*

[5]     Ankylosis is the immobility and consolidation of a joint due to disease, injury, or surgical procedure. Dorland's Illustrated Medical Dictionary 92 (33rd Ed. 2020).

cooperative with a normal mood and affect. *Id*. Dr. Testrake recommended that Newman continue with conservative care for her ankle including wearing custom orthotics and taking Meloxicam in the evening. *Id*. He indicated that he would consider injections if Newman's pain persisted. *Id*.

### 3. *Mental impairment evidence*

According to Newman's school records, she had received special education services. Tr. 848. Newman repeated kindergarten. *Id*. In the third grade, Newman's reading decoding and math calculation scores were in the "significantly low standard" range. *Id*. Newman's delays in reading, written expression, and math achievement were noted, as were her cognitive weaknesses. Tr. 857. Newman's records listed no behavioral incidents. Tr. 848. She did not have any documented social, emotional, or medical problems. *Id*.

In March 2016, a year before Newman's alleged disability onset date, Newman sought treatment at the Coleman Behavioral Health Center to help control her anger. Tr. 355. Newman denied having symptoms of depression but wanted to address symptoms of anxiety, anger, and aggression. *Id*. Newman was living independently and reported having "taken … in" a "male minor" "friend" whom she later acknowledged was her teenage godson. *See* Tr. 20, 355, 1101, 1276. Although Newman struggled to cope with anger and irritability, she was enrolled in her third semester at Stark State College and reportedly a good student. Tr. 356.

Throughout the relevant period, Newman continued to receive psychological counseling and psychiatric medication management at the Coleman Center. *See, e.g.*, Tr. 717–72, 909–1036, 1084–1526, 1539–60. In October 2019, Newman saw board-certified nurse practitioner Mike Putinski, CNP-BC. Tr. 1436. Putinski recorded Newman's diagnoses as recurrent, moderate major depressive disorder with moderate anxious distress, intermittent explosive disorder,[6] and moderate alcohol use disorder. Tr. 1436. Newman reported that she hadn't taken her psychiatric medications for several months and did not feel like herself. Tr. 390. She said that she was experiencing an increase in depression and anxiety symptoms. Tr. 1433. Newman indicated that she hadn't had any panic attacks and denied suicidal ideation. Tr. 390. She reported having taken migraine medication as prescribed that resulted in a suicide attempt, so she was reluctant to take any medication that could increase her risk of suicide. *Id*. Putinski found Newman's hygiene good and her behavior appropriate, though he noted that she was tearful "at times." Tr. 1435. Putinski prescribed Lexapro. Tr. 1437.

That same month, Newman had an appointment Dr. Godlewski. Tr. 803–06. Dr. Godlewski found that Newman was well-oriented with an

---

[6]     Intermittent explosive disorder is a chronic condition characterized by repeated, sudden episodes of impulsive, aggressive, violent behavior or angry verbal outbursts in which one reacts grossly out of proportion to the situation. *Intermittent Explosive Disorder*, Mayo Clinic Diseases & Conditions, https://www.mayoclinic.org/diseases-conditions/intermittent-explosive-disorder/symptoms-causes/syc-20373921 [https://perma.cc/S7ZN-QA6Q].

appropriate mood and affect. Tr. 804. Newman was coherent and her associations were intact. *Id*. She articulated well. *Id*. Her thought content was normal. *Id*. She used normal language and spoke at a normal rate and volume. *Id*. Newman could perform basic computation and apply abstract reasoning. *Id*. Her attention span and ability to concentrate were normal. *Id*. She had appropriate judgment and insight. *Id*. She reported struggling to focus at work due to depression and said that she needed to resist the urge to have angry outbursts. Tr. 314. Newman previously saw a drug and alcohol counselor but was no longer attending counseling sessions. Tr. 315.

In February 2020, Putinski described Newman's anxiety as Newman becoming "irritated with people," which made her "chest get tight." Tr. 990. Newman reported erratic sleep and feelings of overwhelm and impulsivity. *Id*. Newman discussed her ongoing anger issues. *Id*. She admitted that she could get violent. *Id*. Newman said that she had not been taking her medications for "a[]few days" and that her medications weren't "that effective." *Id*. She stated, however, that her "depression and anxiety [were] somewhat manageable" when she took her medications. Tr. 1429. Putinski prescribed Effexor and Trazodone and discontinued Lexapro. Tr. 990.

In July 2020, Putinski noted that Newman had called him from a barbershop for her telehealth appointment "and hung up after a brief report[] of her symptoms." Tr. 998. Although Newman was taking her medications, her anxiety and depression symptoms had increased. Tr. 998. She was having

nightmares. *Id*. She had been having thoughts of suicide but denied having any plans to act on her thoughts. *Id*. Putinski doubled Newman's dosage of Effexor and prescribed Prazosin. Tr. 1002.

In September 2020, Newman told Putinski that her anxiety was at an "all time high" and that she had chest pain. Tr. 1004. Putinski found Newman angry and upset and noted that she was still suffering from nightmares. *Id*. Newman's sleep was "off." *Id*. Her appetite was erratic. *Id*. She had "[s]ome thoughts of suicide" but no plans to act on her thoughts. *Id*.

Less than two weeks later, Newman had a counseling session with Alyssa Aquino at the Coleman Center. Tr. 968–72. Aquino found Newman's demeanor average, her thought process logical and circumstantial, and her thought content unremarkable. Tr. 968–69. Newman reported that neither her symptoms nor her mood had significantly changed. Tr. 969. She told Aquino that she continued to feel anxiety and frustration. Tr. 969. Newman was aware of her behavioral patterns including outbursts of physical anger and said she had a "problem with bottling things up." *Id*.

At the end of September 2020, Newman switched medication-management care providers and began seeing Putinski's colleague Michelle Garrett, CNP-BC, at the Coleman Center. Tr. 1017, 1018. During her initial appointment with Garrett, Newman reported recent stress due to her housing, health, anger, and feelings of not being heard. Tr. 1017. Garrett noted that Newman showed fair insight and response to treatment. *Id*. Garrett

10

discontinued Effexor, increased Remeron, and added Viibryd. *Id*. Garrett continued Newman's prescriptions for Prazosin and Vistaril without adjustment. Tr. 1017.

In October 2020, during a medication-management appointment, Newman reported recent stressors including her romantic relationship and grief. Tr. 1024. She said that her anger and frustration had increased. *Id*. Newman indicated that she did not feel her medication was helping to reduce her anger or anxiety symptoms. *Id*. Newman had experienced "lots of nightmares of her childhood abuse" over the previous two weeks. *Id*. Garrett prescribed Tripleptal and continued Newman's other prescriptions without adjustment. *Id*.

In November 2020, during an individual counseling session with Aquino, Newman's demeanor was average, her speech was clear, her thought process was logical and circumstantial, and her thought content was unremarkable. Tr. 1387–88. Aquino found Newman cooperative and engaged. Tr. 1390. Newman was processing the recent death of her grandmother and expressed concern about seeing certain family members at the upcoming funeral. *Id*. Newman indicated that she had recently relocated to a new apartment and found it frustrating to deal with internet and cable providers. *Id*. Aquino observed that Newman responded favorably to therapeutic interventions. *Id*.

During a December 2020 medication-management appointment, Newman reported "lots [of] stressors and frustration" due to relationship issues and rage. Tr. 1480. Newman told Garrett that she had not taken her medications for almost two weeks. *Id*. Newman explained that she hadn't received the medications until the day before her appointment with Garrett and, moreover, that she believed the medications "didn't work[.]" *Id*. Newman said that she was trying to stay calm despite the anxiety her relocation was causing. *Id*. Garrett recorded that Newman had a "long history" of unstable moods, lack of impulse control, anger issues, PTSD, and non-compliance with treatment. Tr. 1031. Garrett observed that when Newman felt that her medications weren't removing all symptoms, Newman would stop taking her medications and reduce her participation in treatment. *Id*.

During a February 2021 appointment for medication management, Newman told Garrett that her moods had been slightly more stable but she felt sluggish and was sleeping too much. Tr. 1490. Newman rated her depression at a "5" out of ten and her anxiety at a "6" out of ten. *Id*. Newman said that her anger had improved but "she still had her days." *Id*.

During an April 2021 appointment for medication management, Newman reported an increase in nightmares and described her depression and anxiety as "up." Tr. 1518. Newman said that, at times, she had been feeling paranoid and "seeing shadows." *Id*.

12

In May 2021, Newman saw Aquino for individual counseling. Tr. 1506–07. Aquino found Newman cooperative and engaged. Tr. 1507. Newman was able to share and process her thoughts, feelings, and experiences appropriately. *Id*. She indicated that a recent vacation to Georgia with a group of friends had significantly lifted her mood and helped her relax. Tr. 1506, 1507. Aquino noted great improvement in Newman's emotional regulation and the management of her psychological symptoms. Tr. 1507

In May 2021, Newman had a medication management appointment with Garrett. *See* Tr. 1543. Newman acknowledged ongoing anger issues but denied having any recent outbursts. *Id*. Garrett discontinued Prazosin and prescribed Abilify. *Id*. She maintained Newman's prescriptions for Prozac and Depakote without adjustment. *Id*.

During an appointment with Garrett in July 2021, Newman reported recent episodes during which she had acted out and didn't feel like herself. Tr. 1543. Newman reported having experiences that she didn't remember and finding out what she had done or how she had acted from others later. *See* Tr. 1543. Garrett recorded these instances as "some psychosis." *Id*. She noted that Newman had PTSD and personality disorder, which were exacerbated by her use of alcohol and marijuana and her non-compliance with medication. *Id*. Newman reported an increase in mood swings and insisted that Garrett needed to get her medications "right." *Id*. In response, Garrett recounted Newman's history of multiple medication trials with poor results and educated Newman

13

that when Newman stopped taking her medications on her own—as she had done with Abilify—she could be doing so before the medication had a chance to be "titrate[d] up"[7] to an effective dose. Tr. 1543, 1545. Garrett prescribed Latuda, discontinued Abilify, and maintained Newman's other medications without adjustment. *Id.*

In August 2021, Newman told Garrett that Latuda was helping some, though it made her mouth dry. Tr. 1552. Newman reported having anxiety symptoms including ongoing worry but no recent panic attacks. *Id.* She was working on her anger through group and individual counseling. *Id.* She had decreased her use of marijuana, which Garrett encouraged. *Id.*

### 4. Function report

In January 2020, Newman completed a Function Report. Tr. 262–70. This self-reported questionnaire asked Newman to explain how her illnesses, injuries, and conditions limited her ability to work. Tr. 262. Newman explained that she dropped things because her hands weren't able to hold onto them, she forgot things because of her migraines, she couldn't balance because of her left leg issues, and she became angry due to intermittent explosive disorder. *Id.* Newman said that she paid her own bills, counted change, and handled a

---

[7]    In titration, a patient starts taking an initial, low dose of medication which the provider raises—or up-titrates—incrementally until the maximum effective amount—or target dose—has been achieved or side effects occur. *What Does 'Titration' Mean?*, Cleveland Clinic Health Essentials, https://health.clevelandclinic.org/what-does-titration-mean/ [https://perma.cc/LZH2-8YZW].

savings account. Tr. 266. She went out on her own and traveled by public transportation. *Id*. She shopped in-store for herself. *Id*. Newman prepared her own food and meals "maybe sometimes three times" each week. Tr. 265. She did her own laundry and cleaning. *Id*.

### 5. *State agency and other medical opinion evidence*[8]

In February 2020, state agency consulting physician Yeshwanth Bekal, M.D., reviewed the medical record and found that Newman retained the residual functional capacity (RFC)[9] to perform light, unskilled labor with additional limitations. Tr. 122.

In August 2020, consultative examiner Bryan Krabbe, Ph.D., conducted a psychological evaluation. Tr. 862–68. Newman told Dr. Krabbe that she believed she was disabled because her ankle was "messed up," she had anger issues, and she had anxiety. Tr. 862–63. She said that she lived alone and spent her time watching television and listening to music. Tr. 864. Newman said that

---

[8] When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[9] An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

she took care of her own personal hygiene, shopped for her own groceries, and prepared her own meals. *Id*. Newman described a work history including more than 20 past jobs "with off and on employment" and said that she had been terminated on eight occasions. Tr. 864. Newman told Dr. Krabbe about her difficulties at previous jobs. *Id*. She stated that she had "[p]roblems learning." *Id*. Newman said that she had trouble staying focused and performing work tasks in a timely manner. *Id*. She "g[ot] distracted. [Her] mind wander[ed]. She did not get along with supervisors or coworkers." *Id*. Newman reported "problems managing stress at work." *Id*. She told Dr. Krabbe that she "[did] what [she] want[ed] to do at a job … and [did]n't care. If [she] d[id]n't want to do it[,] [she] d[id]n't do it." *Id*.

Dr. Krabbe found that Newman was "marginally cooperative" and noted that it difficult for him to establish rapport. Tr. 865. Newman's grooming and hygiene were adequate. *Id*. She had adequate energy and moved at an appropriate rate of speed. *Id*. She displayed "no loose associations, flights of ideas, or delusions." *Id*. Newman was able to converse at a speed within normal limits but had some difficulty following the conversation and responding to direct questions. *Id*. On occasion, Dr. Krabbe repeated or simplified his questions. *Id*. He noted that while Newman seemed irritable, she did not exhibit anger or hostility toward him and did not display outward signs of anxiety. *Id*.

Dr. Krabbe found that Newman's short-term memory skills were below average. Tr. 866. He found that Newman's attention and concentration skills were below average. *Id*. Dr. Krabbe determined that Newman's general level of intelligence and intellectual functioning "appeared to fall below normal limits." Tr. 865, 866. Dr. Krabbe found that Newman's problems with learning may cause her to struggle to acquire new information in a work setting. Tr. 867. He opined that Newman showed deficits that "could result in increased worry and a corresponding decrease in attention and concentration." *Id*. Dr. Krabbe noted that the self-reported negative affect Newman's mental health problems had previously had on her work performance "may lead to emotional instability" if she were presented with critical supervisory feedback. Tr. 867. He found that this may also cause Newman difficulty in developing and maintaining appropriate co-worker relationships. *Id*. Dr. Krabbe further opined that Newman "presented with limited coping skills to adapt to work pressures and may have difficulty responding to changes in work environments." Tr. 868.

Dr. Krabbe recorded Newman's endorsement of bipolar symptoms including poor mood quality, feelings of worthlessness, loss of energy, insomnia, decreased motivation, difficulty concentrating, social withdrawal, crying spells, distractibility, increase in activity, impulsivity, mood swings, a decreased need for sleep, and racing thoughts. Tr. 866. He recorded that Newman endorsed a "history of emotional deterioration  in response to work

17

pressure." Tr. 868. Based on his examination, Dr. Krabbe diagnosed Newman with unspecified bipolar and related disorder and borderline intellectual functioning. Tr. 867.

Several months later, Dr. Krabbe administered a test of Newman's overall intellectual development and IQ. *See* Tr. 906–08. Dr. Krabbe found that Newman's grooming and hygiene were adequate, she "appeared to put forth good effort completing tasks[,]" and her concentration and attention were "age-appropriate." Tr. 908. Dr. Krabbe noted that Newman had some difficulty following directions and understanding him during the examination. *Id*. He found that Newman's intelligence functioning was in the "extremely low range[.]" *Id*.

State agency psychologist Deryck Richardson, Ph.D., reviewed the medical record in November 2020 and found that Newman was moderately limited in each of the four Paragraph B areas of mental functioning.[10] Tr. 116.

---

[10]     The Social Security Administration categorizes mental disorders into 11 listings: neurocognitive disorders (12.02); schizophrenia spectrum and other psychotic disorders (12.03); depressive, bipolar and related disorders (12.04); intellectual disorder (12.05); anxiety and obsessive-compulsive disorders (12.06); somatic symptom and related disorders (12.07); personality and impulse-control disorders (12.08); autism spectrum disorder (12.10); neurodevelopmental disorders (12.11); eating disorders (12.13); and trauma- and stressor-related disorders (12.15). 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00A1.

Listings 12.07, 12.08, 12.10, 12.11, and 12.13 have two paragraphs designated A and B. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00A2. To meet or equal those listings, a claimant's mental disorder must satisfy the requirements of both paragraphs A and B. *Id*. Listings 12.02, 12.03, 12.04, 12.06, and 12.15 have three paragraphs designated A, B, and C. *Id*. To meet or

Specifically, Dr. Richardson found that Newman was moderately limited in her ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) work in coordination with or in proximity to others without being distracted by them; (5) make simple work-related decisions; (6) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (7) accept instructions and respond appropriately to criticism from supervisors; (8) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (9) respond

---

equal those listings, a claimant's mental disorder must satisfy the requirements of either paragraphs A and B or paragraphs A and C. *Id.* Listing 12.05 has two unique paragraphs, A and B. *Id.* To meet or equal Listing 12.05, a claimant's mental disorder must satisfy the requirements of *either* paragraph 12.05A or 12.05B. *Id.* (emphasis added).

Paragraph A of each listing—except 12.05—includes the medical criteria for submitted evidence. *Id.* Paragraph B of each listing—except 12.05— includes the criteria for consideration in examining the extent to which a mental disorder limits a claimant's functioning. *Id.* Paragraph B sets forth four broad areas of mental functioning used in a work setting: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *Id.* The Commissioner is tasked with deciding the degree to which a medically determinable mental impairment affects a claimant's abilities within the Paragraph B criteria as well as his or her ability to function independently, appropriately, effectively, and on a sustained basis. *Id.* To satisfy Paragraph B, a claimant's mental disorder must result in an "extreme" limitation of one, or a "marked" limitation of two, of the four areas of mental functioning. *Id.* When the Administration refers to "Paragraph B criteria" or "area[s] of mental functioning," it is referring to the Paragraph B criteria present in every listing except 12.05. *Id.*

appropriately to changes in the work setting; and (10) be aware of normal hazards and take appropriate precautions. Tr. 120–21.

Dr. Richardson found that although Newman was markedly limited in the specific task of interacting appropriately with the general public, she was overall only moderately limited in interacting with others. Tr. 120.

Dr. Richardson found that Newman was not significantly limited in her ability to: (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) ask simple questions or request assistance; (7) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; (8) travel in unfamiliar places or use public transportation; and (8) set realistic goals or make plans independently of others. Tr. 120–21.

Dr. Richardson found Newman's judgment sufficient and her insight adequate. Tr. 121. He determined that Newman was able to understand, remember, and carryout simple, one- to two-step tasks. Tr. 121. She could work in a low-stress, static work environment with infrequent or occasional job-related changes that were explained in advance. *Id*. Newman required a job free from fast-paced production quotas. *Id*. She was limited to infrequent and superficial workplace contact with others. *Id*.

In March 2021, upon reconsideration, state agency psychologist Jennifer Swain, Ph.D., reviewed the medical evidence and adopted Dr. Richardson's findings, including that Newman was no more than moderately limited in the four Paragraph B areas of mental functioning. Tr. 126.

State agency physician Elizabeth Das, M.D., also reviewed the medical record upon reconsideration. Tr. 123–32. Dr. Das agreed with Dr. Bekal that Newman had several severe impairments yet nonetheless retained the RFC to perform light, unskilled work with additional limitations. Tr. 132.

### 6. *Testimonial evidence*

Newman and a vocational expert testified during the hearing in August 2021. Tr. 83–111. Newman was represented by attorney John Regas. Tr. 83. In advance of the proceedings, Regas submitted a brief advocating that the ALJ find Newman disabled. Tr. 299–301. Regas suggested that the ALJ pay particular attention to steps three and five of the sequential analysis. *Id*. He argued that Newman satisfied the criteria for Listing 12.05(B) and asserted that the ALJ must find Newman unable to sustain employment at any exertional level due to Newman's "combined mental impairments, "inability to stand [or] walk" beyond a sedentary level, and "inability to use her upper extremities bilaterally more than occasionally[.]" Tr. 300–01. Regas began the substantive portion of the hearing with an opening statement. Tr. 90–92. Newman then testified. Tr. 92–105.

Newman said that she lived on her own in an apartment. Tr. 92. She had attended some college. Tr. 93.    Newman discussed her physical impairments. Tr. 94–97. She said that carpal tunnel syndrome in both of her hands made them tingly and numb. Tr. 94–95. She dropped things frequently as a result. Tr. 94. Newman relieved her symptoms by rubbing her hands and using wrist supports. Tr. 95. Newman discussed having asthma, which made it difficult for her to walk long distances or climb stairs. Tr. 96. Newman's breathing was negatively affected by weather and some environmental factors, too. *Id*. Inhalers relieved her symptoms and helped her breathe. *Id*. Newman described issues with her left foot and ankle that made her lose her balance if she sat or stood for too long. Tr. 97. This impairment had never caused Newman to fall or use an assistive device, but she estimated that it would only allow her to walk one block at most. Tr. 98. Newman said that she experienced headaches that made her dizzy, nauseated, sound- and light-sensitive, and caused her to see stars. Tr. 96–97.

Newman testified about her cognitive issues. Tr. 98. She said that she had a hard time remembering things that she learned. Tr. 98. Newman said that if she were to get a job, her memory would possibly need to be refreshed as to that job each day. *Id*. Sometimes, Newman needed extra attention when she learned new things. Tr. 98–99. She found it difficult to focus and was easily distracted. Tr. 99. Socially, Newman said that her ability to get along with others depended on the person and the day. Tr. 99. Sometimes, she was quick

to anger. *Id*. Newman found therapy helpful and medication sometimes helpful. Tr. 100. At times, she would cry, argue with people, and generally struggle to control her emotions. Tr. 99. Some days, she didn't want to get out of bed. Tr. 100. Other days, she had a lot of energy. *Id*. Newman estimated that she had these periods of high energy three times per week for a couple of hours. *Id*.

Newman discussed her daily life and activities. She said that she handled her own household chores and did her own laundry, dishes, cleaning, cooking, and bathing. Tr. 101. Newman said that she thought it was better to stay to herself and that she hung out with very few people. Tr. 101, 105. She would leave home, however, to go grocery shopping. *Id*. She did not drive and, due to her anxiety, had never obtained a driver's license. Tr. 93, 102. Newman had no problems reading or writing and would ask her case manager for help if she didn't understand a written document. Tr. 103.

After Newman, vocational expert Suman Srinivasan testified. Tr. 105–09. According to Srinivasan, a hypothetical individual with the same age, education, and work experience as Newman and with the limitations assessed in Newman's RFC, described below, could perform unskilled labor at a light level of exertion. Tr. 107. Jobs available to such an individual include merchandise marker, routing clerk, and "inspector and tester" or "inspector and hand packager." Tr. 107–08. There would still be jobs available to such an individual if he or she was only able to occasionally handle or finger bilaterally,

23

however, an over-the-shoulder supervision requirement would be work preclusive. Tr. 108. Being off task for more than 10 percent of the workday or absent more than three days per month would also preclude such an individual from all work. Tr. 108–09.

### The ALJ's decision

The ALJ made the following findings of fact and conclusions of law

1. The claimant has not engaged in substantial gainful activity since November 5, 2019, the application date (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments: Obesity; asthma; migraines; bilateral carpal tunnel syndrome; degenerative joint disease of the left foot and ankle; borderline intellectual functioning; and affective dysfunction diagnosed to include bipolar, depressive, impulse control, and intermittent explosive disorders (20 CFR 416.920(c)).

3. The claimant does not have an impairment or a combination of impairments that meets or medically equals the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), with the following limitations: The claimant can never climb ladders, ropes, or scaffolds, she cannot work at unprotected heights, she cannot drive commercially, she can have no exposure to hazardous machinery, and she must avoid concentrated exposure to humidity, extreme temperatures, dusts, odors, fumes, poor ventilation, and similar pulmonary irritants. The claimant can frequently handle, finger, kneel, crouch, and crawl, but is limited to occasional ramp/stair climbing, to simple routine tasks not performed at a production rate pace,

and to making simple work-related decisions; she can tolerate few changes in a routine work setting, and no more than occasional superficial interaction with supervisors, coworkers, and the general public.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born [in August] 1990. Therefore, she was 29 years old and defined as a younger individual on the date the application was filed (20 CFR 416.963).

7. The claimant's education level is defined as high school or above (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since November 5, 2019, the date the application was filed (20 CFR 416.920(g)).

Tr. 16–28.

## Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a, 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

25

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 404.1520. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

## Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v.*

*Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

## Discussion

*1. Whether, at step three, the ALJ properly considered Listings 12.05 and 12.11 in finding that Newman did not meet or equal either listing*

Newman says that the ALJ "erroneously found that Newman had moderate limitations in each of the '[Paragraph] B' criteria." Doc. 10, at 14 (citing Tr. 24–25). Newman asserts that she established a marked limitation in her ability to interact with others because "Newman's counseling sessions … evidenced that she had a history documenting that she was seriously limited in her ability to interact with others" and "[e]ven the State Agency found that she had a marked limitation with her ability to interact appropriately with the general public. Doc. 10, at 16 (citing Tr. 120, 130). Newman alleges that the ALJ erred in determining that Newman had no more than a moderate limitation "as it was supported by neither his analysis nor the evidence in this matter." Doc. 10, at 16. Newman asserts without factual support that "the medical documentation supported serious limitations in Newman's ability to concentrate and maintain persistence and pace and manage her symptoms" and then says, "[t]hus, contrary to the ALJ's findings," she was "seriously limited in her ability to function independently, appropriately, and effectively." *Id*. Newman claims that the ALJ should have found Newman met or equaled Listing 12.05—since she had a valid IQ under 70, at least two marked

limitations in the "B" criteria and her IQ was noted before age 22—and deemed her disabled at step three. *Id.*

As a threshold matter, Newman claims that the ALJ failed to cite to "any evidence which supported his conclusions." Doc. 10, at 15. Newman is incorrect. While it's true that the ALJ's Paragraph B findings do not include transcript citations to the page on which one can find the evidence cited, contrary to her claim, the ALJ's findings are in fact filled with references to the supporting factual evidence. *See* Tr. 24–25. The findings simply omit citations. The ALJ's findings are supported by substantial evidence in the record, as required. Although his omission of specific page numbers is inconvenient, the omission has no effect on the validity of the ALJ's rationale. *See* Tr. 24–25.

Listing 12.05 covers intellectual disorders characterized by: "significantly subaverage general intellectual functioning, significant deficits in current adaptive functioning, and manifestation of the disorder before age 22." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00H(1). To satisfy Listing 12.05, a claimant must satisfy subpart A or B:

> A. Satisfied by 1, 2, and 3:
>   1. Significantly subaverage general intellectual functioning evident in your cognitive inability to function at a level required to participate in standardized testing of intellectual functioning; and
>   2. Significant deficits in adaptive functioning currently manifested by your dependence upon others for personal needs (for example, toileting, eating, dressing, or bathing); and

    3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

OR

B. Satisfied by 1, 2, and 3:
    1. Significantly subaverage general intellectual functioning evidenced by a or b:
        a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or
        b. A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and
    2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:
        a. Understand, remember, or apply information (see 12.00E1); or
        b. Interact with others (see 12.00E2); or
        c. Concentrate, persist, or maintain pace (see 12.00E3); or
        d. Adapt or manage oneself (see 12.00E4); and
    3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.05, https://www.ssa.gov/disability/

professionals/bluebook/12.00-MentalDisorders-Adult.htm#12_05.

      The ALJ acknowledged Newman's insistence that she satisfied Listing

12.05, however, the ALJ found that Listing 12.05 was "inapplicable to the

claimant's borderline intellectual functioning" which was "governed by Listing 12.11." Tr. 24 (citing Tr. 299–301). Newman had "borderline intellect and coping skills that have been limited by a combination of her bipolar, personality, and other mental impairments, and exacerbated by her medication non-compliance, substance use, and chronic family chaos." Tr. 24. The ALJ cited Newman's "group and individual counseling notes, her medical and psychiatric medication management notes, her history of college-level coursework, independent living, out of state travel, and her household and other activities" as evidence that did not suggest or support Newman having the sort of cognitive, attentive, or adaptive dysfunction that the ALJ could reasonably consider marked or extreme. *Id*. The ALJ added that none of Newman's treating sources had concluded or advised otherwise. *Id*.

The ALJ then discussed Listing 12.11—and Listings 12.04, 12.06, 12.08, and 12.15—in which a successful claimant must meet subparts A and B:[11]

> A. Medical documentation of the requirements of paragraph 1, 2, or 3:
> 1. One or both of the following:
>    a. Frequent distractibility, difficulty sustaining attention, and difficulty organizing tasks; or
>    b. Hyperactive and impulsive behavior (for example, difficulty remaining seated, talking excessively, difficulty waiting, appearing restless, or

---

[11]    Newman's listing argument is based on the Paragraph B criteria. She does not claim that the ALJ erred in finding that she did not meet or equal Listing 12.11, or any other pertinent listing, under subpart C. As a result, there is no need to discuss the requirements of subpart C.

behaving as if being "driven by a
motor").

2. Significant difficulties learning and using
academic skills; or

3. Recurrent motor movement or
vocalization.

AND

B. Extreme limitation of one, or a marked limitation
of two, of the following areas of mental
functioning:

1. the ability to understand, remember, or
apply information.

2. the ability to interact with others.

3. the ability to concentrate, persist, or
maintain pace.

4. the ability to adapt or manage oneself.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.11; https://www.ssa.gov/disability/

professionals/bluebook/12.00-MentalDisorders-Adult.htm#12_11.

The ALJ wasn't certain that Listing 12.11 applied and wrote that "even

if" it did, Newman did not satisfy Listing 12.11—or any other Section 12

listing—because she did not satisfy Paragraph B. Tr. 24–25; 20 C.F.R. § Pt.

404, Subpt. P, App. 1, 12.00B. The ALJ found that Newman's mental

impairments did not result in marked limitations in two, or an extreme

limitation in one, of the four areas of mental functioning as required by

Paragraph B. Tr. 24. Instead, the ALJ determined that Newman was no more

than moderately limited in each area. Tr. 24. Newman challenges this finding

32

and claims that the ALJ failed to connect his findings that Newman failed to meet or equal any listing to the evidence.[12]  *See* Doc. 10, at 18.

Newman's argument disregards, however, the standard of review. She ignores the ALJ's language in the decision, in which he plainly considers the various listing requirements before arriving at each finding—including the Paragraph B findings—through a discussion of the record evidence. *See* Tr. 24–25.  The ALJ's moderately-limited findings for each of the four Paragraph B criteria are in accord with the prior administrative findings of the state agency consulting psychologists and supported by sufficient evidence. *See* Tr. 24–25, 119–21, 126, 129–30. The Commissioner's decision should be upheld.

As concerned Newman's ability to interact with others, the ALJ found that she had no more than a moderate limitation. Tr. 24. Newman claims that her documented anger issues render this conclusion an error. Doc. 10, at 15. I disagree. The ALJ acknowledged that the medical evidence showed that Newman was "angry, irritable, sometimes disingenuous, intermittently resistant" and "chronically conflicted" about her family and other personal relationships with a "history of inappropriate aggression." Tr. 24. He noted,

---

[12]    Newman also asserts that evidence she submitted to the Appeals Council that showed that she "had only passed 14 of 33 attempted hours of [college] instruction" shows that "the ALJ erred when he found concluded that Newman only had borderline intellectual functioning."  Doc. 10, at 15. But Newman doesn't explain why her ability to pass 14 out of 33 hours of college-level instruction would mean that the ALJ erred. Moreover, "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 838 (6th Cir. 2016)

however, that Newman's interactive deficits hadn't led to "legal or other significant consequences." Tr. 24–25. The ALJ observed that Newman's "initial period of resistance" to group and other modalities of treatment had been followed by her "active and productive engagement." Tr. 25. He considered Newman's "continued engage[ment] with friends." Tr. 25; *see also* Tr. 1507. The ALJ recognized that Newman's "easy frustration, cluster B antisocial traits, and diminished intellect" limited Newman's "capacity for comfortable, sustained interaction with others" but ultimately found that Newman's limitations in this area were "neither marked nor extreme." Tr. 25. It is thus not contrary to the evidence that the ALJ found Newman no more than moderately limited in her ability to interact with others. Tr. 24–25, 27.

Moreover, this finding is supported by the prior administrative findings of state agency consulting psychologists Dr. Richardson and Dr. Swain. See Tr. 116, 126. The consulting doctors found that Newman was, overall, no more than moderately limited in the area of interacting with others. Tr. 116, 126. They found that Newman was not significantly limited in her ability to ask simple questions or request assistance, maintain socially appropriate behavior, and adhere to the basic standards of neatness and cleanliness. *Id*. Dr. Richardson and Dr. Swain found that Newman was no more than moderately limited in her ability to accept instructions, respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id*. They opined, however, that

Newman was markedly limited in her ability to interact with the general public. Tr. 27 (*see* Tr. 120). Ultimately, Dr. Richardson and Dr. Swain opined that Newman's mental impairments led to "moderate limitations in the claimant's cognitive, interactive, attentive, and adaptive functioning, *but that the claimant should be precluded from contact with the general public.*" Tr. 27 (citing Tr. 113–22, 124–32) (emphasis added). The ALJ did not agree that Newman should be precluded from contact with the general public. *See* Tr. 24–25, 27. He concluded that "the interactive limitations assessed by the State agency consultants with regard to supervisors and coworkers are sufficient to address the claimant's ability to tolerate contact with the general public." Tr. 27. The ALJ found that such a prohibition was undermined by the record evidence, including Newman's her "group therapy interactions" and her "interactions with strangers in medical and other treatment facilities." Tr. 27. The ALJ found that the evidence had established Newman's "primary interactive deficits involve ex-girlfriends and family, and potentially associates from bars[.]" *Id*. The ALJ, in essence, found that the social interaction determinations of the state agency consulting psychologists were internally incongruent. *See* Tr. 27. The ALJ declined to restrict Newman from interacting with the general public, citing, in part, this internal incongruity. *See* Tr. 27.

The ALJ determined that Newman had moderate limitations in her ability to understand, remember, or apply information. Tr. 24. This area of functioning refers to one's ability to learn, recall, and use information for work

activities, such as learning terms, instructions, and procedures, or following one- or two-step instructions. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00E(1). Newman says that "since [she] graduated from high school (with an IEP)" and "sought mental health treatment," the ALJ found that she was no more than moderately limited in understanding, remembering, and applying information. Doc. 10, at 15. She claims that this represents a conclusion by the ALJ that was "contrary to the evidence." *Id*. When the ALJ's analysis is considered in full, however, it is apparent that his rationale for the finding included more than Newman recites in her brief. He wrote that:

> The claimant has displayed deficits in learning literary and other academic skills, and her reason and judgment has been limited by substance use and by or as a result of medication non-compliance. However, that her abilities to learn, recall, and use information, and to use reason and judgment to make work-related decisions, is evidenced by her attainment of a high school diploma, her completion of college classes, her acknowledged implementation of mental and physical therapeutic strategies and techniques, and by the reason and judgment displayed during group and individual therapies, and in her ability to manage her own as well as others' affairs.

Tr. 24. So, Newman misleads by omission when she argues that the ALJ's finding was based on her graduation from high school and desire for mental health treatment. *See* Doc. 10, at 15. Moreover, those particular facts support the finding that Newman had a moderate capacity for insight and comprehension. It was reasonable for the ALJ to consider them. The ALJ's

36

finding Newman no more than moderately limited in her ability to understand, remember, and apply information is not contrary to the evidence. *Id*.

Here again the ALJ's findings are in accord with the opinions of the state agency consulting psychologists. *See* Tr. 24, 116, 126. Although Dr. Krabbe did not provide the degree to which he found Newman limited, the ALJ's finding in this area is not in conflict with Dr. Krabbe's observations. *See* Tr. 24, 867–68. The ALJ acknowledged that Newman "displayed deficits in learning literary and other academic skills" and that her reason and judgment were "limited by substance use and by or as a result of medication non-compliance." Tr. 24. The ALJ noted, however, that Newman's "abilities to learn, recall, and use information, and to use reason and judgment to make work-related decisions" were shown by her "attainment of a high school diploma, her completion of college classes, her acknowledged implementation of mental and physical therapeutic strategies and techniques." *Id*; s*ee also* Tr. 356, 969, 1390. The ALJ further noted that Newman displayed reason and judgment "during group and individual therapies, and in her ability to manage her own as well as others' affairs." Tr. 24, 355–56, 969, 1101, 1276, 1390, 1507. Newman is thus mistaken to assert that the ALJ's finding is contrary to the evidence. Doc. 10, at 15.

The ALJ found that Newman had moderate limitations in her ability to concentrate, persist, and maintain pace. Tr. 25. This area of functioning refers to one's ability to focus attention on work activities and stay on task at a

sustained rate. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00E(3). The ALJ's findings are in step with the prior administrative findings of the consulting psychologists. *See* Tr. 25, 116, 120, 126, 130. A moderate limitation also does not conflict with Dr. Krabbe's observations of Newman in this area of functioning. *See* Tr. 25, 867. The ALJ noted that Newman had been diagnosed with conditions whose symptoms inherently included "mood swings, low motivation, and restlessness that limit her capacities for attention to detail and sustained concentration/persistence on complex tasks." Tr. 25. The ALJ nonetheless found that Newman's abilities to "maintain reliable attendance and to sustain focused attention while working at an appropriate and consistent pace, without being distracting or needing more than typical rest breaks" were no more than moderate. *Id*. In support of this finding, he cited Newman's "regular completion of routine self- and household-care tasks, her generally reliable attendance at treatment visits, and her ability to articulate from visit to visit the issues at hand and the steps utilized between visits to address those issues." *Id*.: *see also* Tr. 101–03, 262–66, 864–65, 969, 1380, 1506.

The ALJ found that Newman had moderate limitations in her ability to adapt or manage herself. Tr. 25. This area of functioning refers to the ability to regulate emotions, control behavior, and maintain well-being in a work setting. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00E(4). In the ALJ's analysis, he highlighted evidence that showed Newman sought counseling to "learn appropriate anger management techniques" and indicated that this "would

38

improve not only her capacities to self-regulate emotions and behavior on a day-to-day basis, but also her abilities to manage periods of increased stress without the use of substances." Tr. 25; *see* Tr. 355. The ALJ noted, however, that the record contained no evidence—such as a history of incarceration, escalation of supervision, or the need for inpatient care—to show that Newman's adaptation or self-management limitations were marked or extreme when she began treatment. *Id*. The ALJ noted, in fact, that Newman's providers described her relatively quick progress. *Id*. The ALJ found that despite occasional setbacks and relapses, Newman has sustained that progress. *Id*. These findings are consistent with the prior administrative findings of the consulting psychologists, *see* Tr. 25, 116, 120–21, 126, 130, and do not conflict with Dr. Krabbe's observations regarding Newman's capacity for adaptation and self-management. Tr. 25, 868.

So the ALJ made findings supported by substantial evidence in the record in agreement with the prior administrative findings of the state agency consulting psychologist and in accord with Dr. Krabbe's report.[13] Newman says nothing about how substantial evidence does *not* support the ALJ's decision. Instead, her challenges amount to inappropriate "invitations to reweigh the evidence." *Nasser v. Comm'r of Soc. Sec.*, No. 22-1293, 2022 WL 17348838, at

---

[13]    Newman asserts that the "ALJ failed to consider all of Newman's symptoms," "failed to support his decision with substantial evidence, and … did not adequately develop the record to support his RFC." Doc. 10, at 17. Because these assertions are refuted by a review of the ALJ's decision, they amount to throw-away arguments that need no further discussion.

*2 (6th Cir. Dec. 1, 2022). But "[t]his court does not weigh evidence, assess credibility, or resolve conflicts in testimony—that's the ALJ's job." *Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x. 192, 196; *Dyson v. Comm'r of Soc. Sec.*, 786 F. App'x 586, 588 (6th Cir. 2019) (citing *Crum v. Sullivan*, 921 F.2d 642, 644 (6th Cir. 1990)).

### 2. Whether the ALJ properly applied SSR 16-3p in evaluating Newman's subjective symptoms

Newman claims that the ALJ "failed to properly apply the criteria of Social Security Ruling 16-3p" when he failed to find that the intensity, persistence and limiting effects of Newton's symptoms precluded her from "engaging in substantial gainful activity on a full-time and sustained basis." Doc. 10, at 18; *see* Social Security Ruling 16-3p Titles II And XVI: Evaluation Of Symptoms In Disability Claims Social Security Ruling 16-3p Titles II And XVI: Evaluation Of Symptoms In Disability Claims, 82 Fed. Reg. 49,462 (Oct. 25, 2017). Newman describes SSR 16-3p's criteria then includes a lengthy recitation of facts about her mental and physical impairments. *See* Doc. 10, at 19–21. Newman claims that the hearing testimony, written statements, and medical evidence provide evidence of impairments with the requisite intensity, persistence, and limiting effect so as to qualify Newman as disabled. *See* Doc. 10, at 21.

Ruling 16-3p provides "a two-step process for evaluating an individual's symptoms." 82 Fed. Reg. at 49,463. At step one, the ALJ should "determine whether the individual has a medically determinable impairment (MDI) that

could reasonably be expected to produce the individual's alleged symptoms." *Id*. At step two, the ALJ should "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities for an adult or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim." *Id*. at 49,464.

Here, the ALJ found that Newman satisfied step one. He found that Newman's "medically determinable impairments could reasonably be expected to produce the types of symptoms alleged[.]" Tr. 26. So, the issue is about step two. Under step two, the ALJ should consider the objective medical evidence and other evidence, including an individual's statements, medical sources, and non-medical sources. 82 Fed. Reg. at 49,464–65. And when "evaluat[ing] the intensity, persistence, and limiting effects of an individual's symptoms," the ALJ should consider the factors in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). *Id*. at 49,465. These factors are:

> 1. Daily activities;
>
> 2. The location, duration, frequency, and intensity of pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

41

      5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

      6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

      7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id*. at 49,465–66.

      Newman claims that her symptoms "limited her ability to function and complete her activities of daily living." Doc. 10, at 21. According to Newman, the ALJ failed to properly appreciate these factors with respect to Newman's impairments, and "failed to articulate any supportable rationale for his finding that Newman's statements and the evidence" did not support a finding of disability. *Id*. Newman claims that the ALJ "erred when he failed to support his RFC with substantial evidence[.]" *Id*. Newman's claims with respect to her symptoms are in contrast to Newman's own testimony during the hearing and in her function report. *See*, *e.g*., Tr. 101, 103, 105, 165–66. And, to the extent that Newman presented an argument about Ruling 16-3p, Newman is incorrect.

      The ALJ recounted the two-step analysis required by Ruling 16-3p. Tr. 15. So he was plainly aware of Ruling 16-3p. Throughout his decision, the ALJ discussed the factors in Ruling 16-3p, albeit without specifically stating each

factor.[14] *See* Tr. 21–27. The ALJ noted that while Newman's impairments could "reasonably be expected to produce the types of symptoms alleged, the asserted intensity, persistence and limiting effects of those symptoms lack objective and overall record support." Tr. 26 (citing 20 C.F.R. § 416.929 and 416.920c; SSR 16-3p).

Despite Newman's allegations to the contrary, Doc. 10, at 24, the ALJ explicitly considered the location, duration, frequency, and intensity of Newman's pain, as well as its precipitating and aggravating factors. 20 C.F.R. § 416.929(c)(3)(ii)-(iii). The ALJ discussed Newman's carpal tunnel symptoms, left foot and ankle pain, problems with arthritis, migraines, and asthma. Tr. 21 (citing Tr. 262, 863). The ALJ indicated that these physical impairments restricted Newman's ability to walk, bend, and lift objects. *Id*. The ALJ continued, however, noting that Newman didn't claim to have difficulties reaching, sitting, or kneeling. Tr. 21 (citing Tr. 268). He noted that in March 2020, Newman rated her physical pain at a "0" out of ten and had a normal physical examination. Tr. 26 (citing Tr. 1057–58). The ALJ considered an August 2021 electromyogram, which showed that Newman had carpal tunnel syndrome to a *moderate* degree in her right wrist and a *mild* degree in her left.

---

[14]    Even if the ALJ failed to consider all the Ruling 16-3p factors, Newman's argument would still fail because "an ALJ is not required to analyze all seven factors." *Pettigrew v. Berryhill*, No. 1:17-cv-01118, 2018 WL 3104229, at *16 (N.D. Ohio June 4, 2018), *report and recommendation adopted*, 2018 WL 3093696 (N.D. Ohio June 22, 2018). Rather, it is sufficient that an ALJ "consider[s] the relevant evidence," *id*., which the ALJ did.

Tr. 27 (citing Tr. 1583). The ALJ accounted for this limitation in the RFC by limiting Newman to frequent—not unlimited—handling and fingering. *See* Tr. 25. The ALJ pointed out that in August 2021, Newman complained of left foot and ankle pain but denied back or muscle pain and her physical examination showed that she had full strength, full range of motion without pain in her foot, and no neurological deficits. Tr. 27 (citing Tr. 1569–70).

Additionally, the ALJ explicitly considered Newman's subjective mental impairment symptoms. He discussed the fact that Newman is easily distracted and has significant limitations in handling stress and adapting to changes in routine. Tr. 21 (citing Tr. 268–69). The ALJ noted, however, that Newman denied having difficulties completing tasks, concentrating, following instructions, and understanding. Tr. 21 (citing Tr. 268). The ALJ highlighted Newman's completion of several semesters of college courses where she was reportedly a good student. Tr. 24. He referenced treatment notes showing Newman's "improved emotional regulation and symptom management" and consistent cooperation during counseling sessions and medical appointments. Tr. 22, 24 (citing Tr. 356, 1569). The ALJ relied on Newman's own reports to establish her improved mood and relaxed feelings following a vacation with friends. Tr. 23 (citing Tr. 1506–07).

The ALJ also expressly considered the effectiveness of Newman's medications, the treatments Newman received other than medication, and the additional measures Newman took to relieve her pain and other symptoms. 20

C.F.R. § 416.929(c)(3)(iv)-(vi). For example, the ALJ highlighted Newman's attempts to alleviate her carpal tunnel symptoms with wrist splints, physical therapy exercises, and steroid injections, to no alleged avail. Tr. 26 (citing Tr. 869–905). The ALJ cited physical therapy notes confirming that despite Newman rating her pain at a "9" out of ten, the therapist found that Newman was able to ambulate normally and did not show physical signs of pain consistent with such a high level of severity. Tr. 26 (citing 869–870).

Concerning Newman's mental impairments and medication, the ALJ highlighted Newman's deep involvement with group and individual therapy as an alternative to medication. Tr. 18. He highlighted Newman's use of adaptive coping skills to great effect in managing anger. Tr. 18 (citing Tr. 1103, 1107).

The ALJ discussed Newman's history of regular and repeated non-compliance with prescribed medications. Noting Newman's complaints in the weeks prior to the August 2021 hearing, which included "episodes of psychotic/blackout anger" that Newman attributed to Garrett failing to get her "medications right," Tr. 23 (citing 1539–60), the ALJ wrote that Newman "simultaneously and again acknowledged medication non-compliance, alcohol use, and marijuana use" claiming that marijuana was the only thing that calmed her. Tr. 23. The ALJ properly relied upon Newman's lack of compliance with her medication to support the conclusion that Newman's symptoms were not as severe as she alleged. *See Ferguson v. Comm'r of Soc. Sec.*, No. 3:20-ccv-2076, 2021 WL 6772953, at *11 (N.D. Ohio Oct. 12, 2021) (citing *Soto v.*

*Comm'r of Soc. Sec.*, 2014 WL 1576867, at *8 (N.D. Ohio Apr. 18, 2014) ("Non-compliance is an appropriate ground for adversely assessing a claimant's credibility.")), *report and recommendation adopted,* 2022 WL 294833 (N.D. Ohio Feb. 1, 2022). And if a claimant does not follow the prescribed treatment without a good reason, the SSA regulations indicate that the claimant will not be found disabled. 20 C.F.R. § 404.1530(b). While the ALJ acknowledged that at times, "insurance issues" contributed to Newman's non-compliance, at other points, Newman reported having run out of medication and simply neglecting to have it refilled. Tr. 26 (citing Tr. 1057, 1070). More substantially, Newman regularly stopped taking medications she felt were ineffective before they had a chance to be increased to a potentially effective dose. *See, e.g.*, Tr. 1543, 1545. In her brief, Newman fails to establish a good reason for failing to follow her prescribed treatment. *See Myers v. Comm'r of Soc.* Sec., No. 1:21-cv-2381, 2023 WL 369435, at *4 (N.D. Ohio Jan. 24, 2023) (noting, as an example of objective evidence that was inconsistent with a claimant's subjective allegations, the claimant's "non-compliance with her treatment").

The ALJ considered Newman's capacity to independently take care of her activities of daily living, including personal hygiene needs and care, household chores, grocery shopping, and meal preparation. Tr. 22 (citing Tr. 262, 864, 969, 1380, 1506); 20 C.F.R. § 416.929(c)(3)(i). The ALJ cited Newman's ability to go out alone, use public transportation, watch television, listen to music, and travel out of state with groups of friends on vacation. *Id.*

The ALJ noted that Newman lived alone and served—for a period of time—as caretaker for her teenage godson. Tr. 20, 23 (citing Tr. 402, 989, 1382).

So the ALJ followed the requirements of Ruling 16-3p. Newman's contrary argument again amounts to an invitation to ignore the standard of review and  reweigh the evidence. This Court cannot accept that invitation. See *Jones*, 336 F.3d at 477.

### 3. Whether the ALJ appropriately considered Newman's obesity and allegations of pain when he formulated Newman's RFC

Newman challenges the RFC in light of her obesity in combination with her other impairments and claims that the ALJ violated Social Security Rule (SSR) 19-2p by failing to account for the "greater functional limitations" caused by the combination of Newman's "obesity and other physical problems." Doc. 10, at 22–23. She further alleges that the ALJ "compounded this error" when he "appeared to discount" Newman's "allegations of disabling pain." Doc. 10, at 23. I have already addressed the ALJ's consideration of Newman's pain above, thus I will address the ALJ's consideration of Newman's obesity here.

An ALJ is charged with "assess[ing] a claimant's RFC 'based on all of the relevant medical and other evidence' of record." *Harris v. Comm'r of Soc. Sec. Admin.*, No. 1:13-cv-260, 2014 WL 346287, at \*11 (N.D. Ohio Jan. 30, 2014) (quoting 20 C.F.R. § 416.945(a)(3)). Importantly, "[t]he Social Security Act instructs that the ALJ—not a physician—ultimately determines a claimant's RFC." *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010). SSR 19-2p requires the consideration of the effects of obesity under

47

the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, and the extent to which a claimant's obesity may impact his or her other impairments. DI 24570.001 SSR 19-2p: Titles II and XVI: Evaluating Cases Involving Obesity, SSA POMS DI 24570.001, https://www.ssa.gov/OP_Home/rulings/di/01/SSR2019-02-di-01.html. Under SSR 19-2p, an ALJ is directed to consider the effects of obesity not only under the Listings, but also during the other steps of the sequential evaluation, including the determination of a claimant's RFC. *Id*. Once an ALJ has determined that obesity is a medically determinable impairment, the ALJ must consider the potential functional limitations caused by obesity in the claimant's RFC assessment. *Id*. Newman argues that while the ALJ considered her obesity, which is undisputed, the ALJ erred in finding that it did not cause or contribute to a "listing-equivalent dysfunction." *See* Doc. 10, at 23. Newman says that if the ALJ had properly considered Newman's obesity in combination with her other impairments, he would have found her unable to perform labor at a light level of exertion. Doc. 10, at 22. A plain reading of the ALJ's decision, however, shows otherwise. *See, e.g.,* Tr. 16, 25, 26, 27.

The ALJ expressly considered Newman's obesity found that it was one of Newman's severe impairments. Tr. 25. The ALJ cited Newman's obesity—in combination with her other impairments—to support limiting Newman to light labor. Tr. 26. The ALJ noted various levels of Newman's obesity in context with her symptoms at that time. For example, he considered that "in late 2019,

48

[Newman] had a Body Mass Index in excess of 47 and obesity-related dyspnea." Tr. 26 (citing Tr. 804). The ALJ noted that in a March 2020 appointment to address her GERD symptoms, Newman "reported a pain level of "zero" despite a BMI of about 51." Tr. 26 (citing Tr. 813). The ALJ observed that Newman's "Tinel's testing remained positive … into early 2021, at which time the claimant also had a documented BMI approaching 52[.]" Tr. 26 (citing Tr. 1038).

The ALJ also discussed the prior administrative findings of the state agency consultative physicians. Tr. 27. Both doctors found that Newman retained the RFC to perform unskilled, light labor and supported this finding with reference to Newman's obesity in combination with her history of left foot fracture, carpal tunnel syndrome, and mild asthma. *Id.* (citing Tr. 118, 128). Once the ALJ conducted his analysis of the evidence, he set forth a more restrictive physical RFC than the agency physicians suggested. The ALJ limited Newman to never climbing ladders, ropes, or scaffolds while the agency physicians found that she could occasionally perform those duties if required for work. *Compare* Tr. 25, *with* Tr. 118, 128.

Newman fails to identify additional other functional limitations she had as a result of her obesity, and does not allege any impairment unaccounted for in the RFC. Newman instead makes the unsupported claim that based on her left foot and ankle issues and related pain as well as her reduced capacity for handling and fingering due to carpal tunnel syndrome, the ALJ should have

found that she was incapable of light labor. *See* Doc. 10, at 24. So Newman's argument amounts to an invitation for the Court to reweigh the evidence, which the Court cannot do. Moreover, while Newman may disagree with the ALJ's finding, disagreement does not entitle her to remand.

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: September 20, 2023

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019)